**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FIFTY-SIX HOPE ROAD MUSIC, LTD.;
ZION ROOTSWEAR, LLC,
*Plaintiffs-Appellees*,

v.

A.V.E.L.A., INC.; X ONE X MOVIE
ARCHIVE, INC.; CENTRAL MILLS,
INC. (FREEZE); LEO VALENCIA,
*Defendants-Appellants*,

and

JEM SPORTSWEAR,
*Defendant*.

No. 12-17502

D.C. No.
2:08-cv-00105-
PMP-GWF

FIFTY-SIX HOPE ROAD MUSIC, LTD.;
ZION ROOTSWEAR, LLC,
*Plaintiffs-Appellees*,

v.

A.V.E.L.A., INC.; X ONE X MOVIE
ARCHIVE, INC.; CENTRAL MILLS,
INC. (FREEZE); LEO VALENCIA,
*Defendants*,

No. 12-17519

D.C. No.
2:08-cv-00105-
PMP-GWF

and

JEM SPORTSWEAR,
          *Defendant-Appellant.*

---

FIFTY-SIX HOPE ROAD MUSIC, LTD.;       No. 12-17595
ZION ROOTSWEAR, LLC,
          *Plaintiffs-Appellants*,       D.C. No.
                                        2:08-cv-00105-
              v.                          PMP-GWF

A.V.E.L.A., INC.; X ONE X MOVIE
ARCHIVE, INC.; CENTRAL MILLS,
INC. (FREEZE); LEO VALENCIA; JEM
SPORTSWEAR,
          *Defendants-Appellees.*

---

FIFTY-SIX HOPE ROAD MUSIC, LTD.;       No. 13-15407
ZION ROOTSWEAR, LLC,
          *Plaintiffs-Appellees*,        D.C. No.
                                        2:08-cv-00105-
              v.                          PMP-GWF

A.V.E.L.A., INC.; X ONE X MOVIE
ARCHIVE, INC.; LEO VALENCIA,
          *Defendants-Appellants.*

FIFTY-SIX HOPE ROAD MUSIC, LTD.;
ZION ROOTSWEAR, LLC,

*Plaintiffs-Appellants*,

v.

A.V.E.L.A., INC.; X ONE X MOVIE
ARCHIVE, INC.; LEO VALENCIA;
CENTRAL MILLS, INC. (FREEZE); JEM
SPORTSWEAR,

*Defendants-Appellees*.

No. 13-15473

D.C. No.
2:08-cv-00105-
PMP-GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, Senior District Judge, Presiding

Argued and Submitted
July 8, 2014—San Francisco, California

Filed February 20, 2015

Before: Ferdinand F. Fernandez, N. Randy Smith,
and Morgan Christen, Circuit Judges.

Opinion by Judge N.R. Smith;
Partial Concurrence and Partial Dissent by Judge Christen

## SUMMARY[*]

### Lanham Act

The panel affirmed the district court's judgment after a jury trial on claims under the Lanham Act and Nevada state law regarding the use of Bob Marley images on apparel and other merchandise.

Affirming the denial of defendants' post-trial motion for judgment as a matter of law on a false endorsement claim, the panel held that sufficient evidence supported the jury's finding that defendants violated the Lanham Act because they (a) used Marley's image (b) on their t-shirts and other merchandise, (c) in a manner likely to cause confusion as to plaintiffs' sponsorship or approval of these t-shirts and other merchandise. The panel held that defendants waived several defenses. It rejected the argument that allowing a plaintiff to vindicate a false endorsement claim based on the use of a deceased celebrity's persona essentially creates a federal right of publicity.

The panel held that the district court did not abuse its broad discretion in determining the profits for three defendants. There was sufficient evidence to find that defendant Freeze willfully infringed plaintiffs' rights. The Seventh Amendment did not require that a jury calculate these profits.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion by ordering three defendants to pay attorneys' fees to plaintiffs because (1) plaintiffs were prevailing parties, and (2) the case was exceptional, as these defendants' conduct was willful.

The panel affirmed the district court's grant of summary judgment to defendants on a right of publicity claim under Nevada law.

The panel held that there was sufficient evidence to support the jury's finding that three defendants interfered with plaintiffs' prospective economic advantage.

The panel held that the district court did not err in granting defendants' motion for judgment as a matter of law on the issue of punitive damages.

Concurring in part and dissenting in part, Judge Christen concurred in the result but did not join the reasoning in Subsection I.B.2 of the majority's opinion, addressing likelihood of confusion. Judge Christen wrote that the narrow holding in Part I, concluding that the evidence presented at trial was sufficient for the jury to find that defendants violated the Lanham Act by using Marley's likeness, was dictated by the standard of review on appeal, and by the defenses actually pursued by defendants.

**COUNSEL**

Jill M. Pietrini (argued) and Paul A. Bost, Sheppard, Mullin, Richter & Hampton, Los Angeles, California, for Plaintiff-Appellee/Cross-Appellant Fifty-Six Hope Road Music, Ltd.

Timothy J. Ervin (argued), Gallant & Ervin, Chelmsford, Massachusetts, for Plaintiff-Appellee/Cross-Appellant Zion Rootswear, LLC.

Michael Bergman (argued), Law Offices of Michael Bergman, Century City, California, and Melissa W. Woo, Carlsbad, California, for Defendants-Appellants/Cross-Appellees A.V.E.L.A., Inc., X One X Movie Archive, Inc., Central Mills, Inc., and Leo Valencia.

John Yates (argued), Greenberg & Bass LLP, Encino, California, for Defendant-Appellant/Cross-Appellee Jem Sportswear, Inc.

**OPINION**

N.R. SMITH, Circuit Judge:

1. The district court did not err by denying Defendants' post-trial motion for judgment as a matter of law on the Lanham Act false endorsement claim of Fifty-Six Hope Road Music ("Hope Road") and Zion Rootswear, LLC ("Zion"). The jury found Appellees, A.V.E.L.A., X One X Movie Archive, Leo Valencia, Freeze, and Jem Sportswear (collectively "Defendants"), (a) used Bob Marley's image (b) on their t-shirts and other merchandise, (c) in a manner likely to cause confusion as to Plaintiffs' sponsorship or

approval of these t-shirts and other merchandise. *See* 15 U.S.C. § 1125(a); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992). Defendants waived several defenses to the Plaintiffs' claim by failing to properly raise them in the district court. *See Arizona v. Components Inc.*, 66 F.3d 213, 217 (9th Cir. 1995). Given such waivers, and without opining on the merits of those defenses, we must affirm on the basis that there was sufficient evidence to support the jury's verdict for Plaintiffs.

2. The district court did not abuse its broad discretion in determining the profits for A.V.E.L.A., Freeze, and Jem Sportwear ("Jem"). There was sufficient evidence to find Freeze willfully infringed Plaintiffs' rights, because Freeze's vice president of licensing testified that she knew that Plaintiffs had the right to merchandise Marley's image before Freeze began selling similar goods. The Seventh Amendment does not require that a jury calculate these profits, because juries have not traditionally done so, and a claim for profit disgorgement is equitable in nature. *See Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 561 (9th Cir. 1992).

3. The district court did not abuse its discretion by ordering A.V.E.L.A., X One X Movie Archive, and Valencia (collectively "A.V.E.L.A. Defendants") to pay attorneys' fees to Plaintiffs, because (1) Plaintiffs were prevailing parties, having achieved a material alteration in their legal relationship with Defendants, *see Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d 1027, 1030 (9th Cir. 2009); and (2) the case was exceptional, as Defendants' conduct was willful, *see Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000). Because there was less evidence of Jem's and Freeze's willfulness, the district court

was also not required to order them to pay Plaintiffs' attorneys' fees.

4. We affirm the district court's grant of summary judgment to Defendants on the right of publicity claim, because Nev. Rev. Stat. § 597.800.4 and .5 unambiguously provides that a publicity right successor waives its publicity rights (and not just the right to sue a particular defendant) when it fails to timely register its rights.

5. There was sufficient evidence to support the jury's finding that A.V.E.L.A. Defendants interfered with Plaintiffs' prospective economic advantage, based on Hope Road's licensing agent's testimony that one of Hope Road's licensees lost an order intended for Walmart, because Jem sold Marley t-shirts there.

6. Finally, the district court did not err in granting Defendants' motion for judgment as a matter of law on the issue of punitive damages, because the district court's statement during trial did not contradict its later grant of the motion.

## FACTS & PROCEDURAL HISTORY

Bob Marley transcended celebrity roles from pop idol to muse, championing social change and diffusing his music and message to an ever-growing audience. Even now—more than thirty years after his death—Marley's influence continues to resonate, and his iconic image to command millions of dollars each year in merchandising revenue. The primacy of rights to Marley's image forms the basis of the instant case.

Plaintiff Hope Road is an entity owned by Marley's children, formed for the purpose of acquiring and exploiting assets, rights, and commercial interests in the late Bob Marley. In 1999, Hope Road granted Zion an exclusive license to design, manufacture, and sell t-shirts and other merchandise bearing Marley's image. Hope Road authorizes Zion to use hundreds of different images of Marley on its products.

Defendants were involved with the sale of competing Marley merchandise. A.V.E.L.A. publishes and licenses photographs, images, movie posters, and other artwork for use in the retail marketplace. Defendant X One X Movie Archive holds the copyrights to these photographs, images, movie posters, and other artwork; and Valencia serves as president and CEO of both companies. In 2004, A.V.E.L.A. acquired some photos of Marley from a photographer named Roberto Rabanne. After acquiring the Marley photographs, A.V.E.L.A. began licensing them to defendants Jem and Freeze (as well as entities not a party to this suit) for the production of Marley t-shirts and other merchandise. These items were sold at Target, Walmart, and other large retailers.

On January 23, 2008, Plaintiffs filed suit against Defendants, alleging five claims arising from Defendants' use of Marley's likeness: (1) trademark infringement under 15 U.S.C. § 1114, (2) false endorsement under 15 U.S.C. § 1125(a), (3) common law trademark infringement, (4) unauthorized commercial use of right to publicity under Nev. Rev. Stat. § 597.770 et seq., and (5) intentional interference with prospective economic advantage.

The district court granted Defendants' motion for summary judgment as to the 15 U.S.C. § 1114 claim, the

common law trademark claim, and the state law right of publicity claim. The two remaining claims were tried to a jury between January 4 and January 20, 2011. Plaintiffs won on their interference claim, although only against A.V.E.L.A. Defendants. The jury awarded $300,000 in compensatory damages for the interference.

The jury also returned a verdict in favor of Plaintiffs on the 15 U.S.C. § 1125(a) claim with respect to all Defendants. Prior to trial, Plaintiffs had requested that a jury calculate Defendants' profits, for which Plaintiffs sought disgorgement. The district court denied this request and reopened discovery after trial for submission of evidence of A.V.E.L.A.'s, Jem's, and Freeze's profits from Marley merchandise. Subsequently, the district court assessed A.V.E.L.A.'s net profits at $348,543.00; Jem's at $413,638.29; and Freeze's at $19,246.54. On July 3, 2012, the district court entered judgment against A.V.E.L.A., Jem, and Freeze in these amounts.

Plaintiffs also moved for attorneys' fees, and the district court ordered A.V.E.L.A. Defendants to pay $1,518,687.94.

Defendants appealed the judgment. A.V.E.L.A. and Freeze additionally appealed the award of profits, and A.V.E.L.A. Defendants also appealed the order to pay attorneys' fees. Plaintiffs appealed the order granting summary judgment on the right of publicity claim, the order granting judgment as a matter of law on their punitive damages claim, the order awarding profits, and the order awarding attorneys' fees. All of these timely appeals were consolidated.

We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### I. The district court did not err in denying the renewed motion for judgment as a matter of law on Plaintiffs' false endorsement claim.

This case presents a question that is familiar in our circuit: when does the use of a celebrity's likeness or persona in connection with a product constitute false endorsement that is actionable under the Lanham Act? We conclude that the evidence presented at trial was sufficient for a jury to find Defendants violated the Lanham Act by using Marley's likeness. Our narrow holding relies on the familiar principles that underlie celebrity false endorsement claims, and we reject Defendants' contention that the application of those principles results in a federal right of publicity.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

On appeal, Defendants raise several potentially salient defenses to challenge the judgment against them on the

§ 1125(a) claim. However, we will not undo the entirety of the proceedings in the court below and reverse the jury's verdict when these defenses were not sufficiently asserted in the district court to preserve them for appeal. *See Components Inc.*, 66 F.3d at 217. We express no opinion on the waived defenses' applicability to this case or any future case, and address only the reviewable issues below.[1]

### A. Hope Road has a property right under the Lanham Act to Marley's persona.

Defendants claim that the § 1125(a) claim fails as a matter of law, because a celebrity's "persona" is too "amorphous" to constitute a "name, symbol, or device" under § 1125(a). This premise is incorrect. Our jurisprudence recognizes a § 1125(a) claim for misuse of a celebrity's persona. "[A] celebrity whose endorsement of a product is implied through the imitation of a distinctive attribute of the celebrity's identity, has standing to sue for false endorsement

---

[1] Defendants waived the aesthetic functionality defense by raising it only in their Answer and never developing the theory. They waived the Copyright Act defense under *Dastar Corp. v. Twentieth Century Fox Film, Corp.*, 539 U.S. 23 (2003) by never addressing it in the district court. They waived the First Amendment defense under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). On summary judgment, the Defendants argued the alternate test (likelihood of confusion) to the exclusion of the *Rogers* test, and they did not respond to Plaintiffs' treatment of the *Rogers* test. We specifically note that *Curtis Publishing Company v. Butts*, 388 U.S. 130 (1967) does not preclude waiver of the First Amendment defense in this case. *See id.* at 145. Here, there was no intervening change in the law; this court recognized the *Rogers* test well before the trial in the instant case occurred. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (adopting the *Rogers* standard). Moreover, upon our review, the record has not been sufficiently developed to rule on these issues. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1319 (9th Cir. 1998).

under section 43(a) of the Lanham Act." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1385, 1391 (2014); *see also White*, 971 F.2d at 1400 (analyzing the level of recognition of the celebrity's "persona" to determine whether a likelihood of confusion exists under § 1125(a)); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir. 1997) (analyzing § 1125(a) claims actors who played characters in *Cheers* brought against the creator of animatronic figures set in airport bars modeled after the *Cheers* set).

### B. There was sufficient evidence at trial to support the jury's finding that consumers would likely be confused about whether Plaintiffs sponsored or approved Defendants' Marley products.[2]

#### 1. Standard of review

We review de novo the denial of a renewed motion for judgment as a matter of law. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014). We must sustain the verdict unless "the evidence, construed in the light most favorable to the nonmoving party, permits only one

---

[2] We only entertain A.V.E.L.A. Defendants' and Freeze's sufficiency of the evidence challenges on appeal, because Jem failed to file a post-verdict motion for judgment as a matter of law—an "absolute prerequisite to any appeal based on insufficiency of the evidence." *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007).

Contrary to Hope Road's argument, A.V.E.L.A. Defendants and Freeze argued insufficiency of the evidence in their post-verdict Rule 50(b) motion and thus preserved the issue for appeal. *See Components Inc.*, 66 F.3d at 217.

reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). In determining whether the verdict is supported by sufficient evidence, we do not weigh the evidence. *Harper v. City of L.A.*, 533 F.3d 1010, 1021 (9th Cir. 2008). Instead, we "must . . . draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

### 2.  Analysis

"The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused" as to the sponsorship or approval of the goods bearing the marks at issue in the case.[3]  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). In celebrity cases, the court generally applies eight factors to determine likelihood of confusion:

> 1. [T]he level of recognition that the [celebrity] has among the segment of the society for whom the defendant's product is intended;
>
> 2. [T]he relatedness of the fame or success of the [celebrity] to the defendant's product;
>
> 3. [T]he similarity of the likeness used by the defendant to the actual [celebrity];
>
> 4. [E]vidence of actual confusion;

---

[3] At oral argument, Plaintiffs disclaimed any theory that consumers would likely be confused as to the *origin* of Defendants' goods.

5. [M]arketing channels used;

6. [L]ikely degree of purchaser care;

7. [D]efendant's intent on selecting the [celebrity]; and

8. [L]ikelihood of expansion of the product lines.

*Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007–08 (9th Cir. 2001). These factors "are not necessarily of equal importance, nor do they necessarily apply to every case." *Id.* at 1008. "The list of factors is not a score-card—whether a party 'wins' a majority of the factors is not the point. Nor should '[t]he factors ... be rigidly weighed; we do not count beans.'" *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002), *superseded by statute on other grounds*, Trademark Dilution Revision Act of 2006, Pub. L. No. 108-312, 120 Stat. 1730 (codified at 15 U.S.C. § 1125). Where the plaintiff is not the celebrity himself, an additional factor becomes relevant: the strength of association between the mark and the plaintiff. *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1217 (C.D. Cal. 2000) ("*Cairns II*").

Examining the record as a whole in light of these factors, we cannot say that the evidence compels a finding contrary to the jury's verdict. *See Pavao*, 307 F.3d at 918.

First, Plaintiffs presented undisputed testimony to establish a high level of recognition of Marley's image among Defendants' target market. As to the second factor, Plaintiffs also introduced testimony that Marley's image has long been associated with apparel. Marley used to sell his

own merchandise, and his successors-in-interest have continued to do so. No one disputes the third factor: A.V.E.L.A. used actual photos of Marley on its merchandise.

The fourth factor, evidence of actual confusion, draws the most fire from A.V.E.L.A. Defendants and Freeze in the form of objections to the consumer confusion survey. The survey collected data from 509 face-to-face interviews conducted by professional interviewers with individuals in shopping malls. The survey respondents were divided into a test group and a control group. Interviewers showed the test group an actual A.V.E.L.A. T-shirt bearing Bob Marley's image and showed the control group a T-shirt bearing the image of an unrenowned African-American man with dreadlocks. Several questions were put to both groups, including: "Who do you think gave their permission or approval for this particular T-shirt to be made or put out?" Thirty-seven percent of the test group answered that "Bob Marley/the person on the shirt or his heirs, estate, or agents" gave their permission or approval for the T-shirt to be made or put out. Twenty percent of the control group answered the same. Many survey respondents subsequently opined that the law required permission from the person whose image appeared on the shirt. We need not entangle ourselves in lay legal opinion. Rather, we look solely at the former set of responses, which indicates actual confusion. The latter responses only answer *why* some of those surveyed were confused.

A.V.E.L.A. Defendants and Freeze argue that the "survey questions were indefinite with respect to endorsement by Marley. . . . A viable false endorsement claim should have an identifiable person as the putative endorser." A.V.E.L.A. offers no precedent showing that it must be a single entity that is falsely attributed as the party that approved the product

or that the survey taker must be able to identify the party. Thus, identifying Marley or whoever holds the rights to his persona in the alternative does not render the survey data useless or irrelevant. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963). Rather, the imprecision of the data merely decreases its probative value. Drawing all reasonable inferences in Plaintiffs' favor, *Harper*, 533 F.3d at 1021, the survey shows some actual confusion. *See Thane Int'l, Inc.*, 305 F.3d at 902–03. Accordingly, the jury could rely on the data (along with evidence of the other factors) to find likelihood of confusion. Evidence of actual confusion is *relevant* to likelihood of confusion but *not required* in a false endorsement claim. *See Gracie*, 217 F.3d at 1068 (holding that a 15 U.S.C. § 1114 violation does not require evidence of actual confusion, because only "likelihood of confusion" is mentioned in the statute).[4]

Regarding the fifth factor, marketing channels used, Hope Road introduced testimony that A.V.E.L.A.'s licensees sold A.V.E.L.A.-licensed Marley products in some of the same retail stores as Plaintiffs and Plaintiffs' licensees—Wet Seal, J.C. Penney, Target, and Walmart.

---

[4] A.V.E.L.A. Defendants and Freeze also argue that the district court abused its discretion by failing to reopen discovery so that they could respond to the survey evidence. However, they "forfeit[ed their] right to appellate review" of the magistrate judge's nondispositive order denying their motion to reopen, for failure to file any objections with the district court. *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996); Fed. R. Civ. Proc. 72(a); Advisory Committee Notes to Fed. R. Civ. Proc. 72, 97 F.R.D. 165, 228 (Rule 72(a) applies to oral orders read into the record.).

Sixth, the likely low degree of purchaser care was also supported by testimony at trial. Liza Acuna, A.V.E.L.A.'s licensing agent, testified that she did not believe A.V.E.L.A.'s licensed t-shirts priced $7.50 and $12.99 were expensive. Kimberly Cauley, vice president of licensing at Freeze, testified that Freeze's Marley apparel priced $10.00 to $15.00 was "generally not expensive." Jacob Goldszer of JGR Copa, A.V.E.L.A.'s beach towel licensee, testified that beach towels are "impulse item[s]." Heather Vogel, buyer for Target, testified that graphic t-shirts priced $9.99 to $14.99 were "a good value" and "an impulse purchase." A.V.E.L.A. Defendants and Freeze do not dispute that low prices imply correspondingly low consumer care when purchasing Defendants' Marley products. *See Cairns II*, 107 F. Supp. 2d at 1218.

With respect to the seventh factor, the salient inquiry is not whether A.V.E.L.A. Defendants and Freeze knew their actions were unlawful, but whether they intended to "confus[e] consumers concerning the endorsement of [their products]." *White*, 971 F.2d at 1400 (internal quotation mark omitted). To that end, Plaintiffs showed the jury photographs comparing an A.V.E.L.A.-licensed t-shirt to a t-shirt Zion had been selling for ten years. Both t-shirts featured a single, soft-focus image of Marley's face with his mouth open slightly, as if speaking. Both t-shirts are black, and overlay Rastifarian green, yellow, and red in dithered stripes across Marley's face. Viewed in the light most favorable to Plaintiffs, one would infer that A.V.E.L.A. Defendants sought to associate their product with Plaintiffs by intentionally creating similar merchandise.[5]

---

[5] The parties do not address the eighth *Downing* factor, likelihood of expansion of the product lines.

Because the celebrity himself, Marley, is not the plaintiff, we must apply the additional factor–the strength of the association between Marley and the Plaintiffs. That carries greater weight where, as here, the evidence introduced to support the *Downing* factors primarily demonstrates that *the celebrity himself* sponsored or approved the defendants' products. Under these circumstances, the additional factor and the seventh factor wax in significance, because they link likelihood of confusion to Plaintiffs. *See Cairns II*, 107 F. Supp. 2d at 1217.

In *Cairns II*, the court held that Princess Diana's image was only weakly associated with the plaintiffs, largely because Princess Diana's image had not served a source-identifying (trademark) function during her life or after her death. *See id.* "[P]ervasive unauthorized use of a celebrity's persona will tend to dull the popular perception that use of that persona signifies an endorsement at all, weakening the initial automatic association between the celebrity and his or her estate." *Id.* (alteration in original). The *Cairns* defendants had been selling products bearing Princess Diana's image since before her death, and other parties had been doing the same. *Id.* Critical to the analysis, Princess Diana "knew of the vast commercial uses of her image" and "did nothing to prevent others from using her image while she was alive." *Id.*

Here, unlike Princess Diana, Marley sold merchandise bearing his image during his lifetime, and his successors-in-interest have continued to do so, implying that his image served (and continues to serve) a source-identifying function. There has been significant unauthorized use of Marley's persona since his death. However, that use was not "uncontested" as in Princess Diana's situation. Plaintiffs introduced uncontroverted evidence that they and their

predecessors have sent more than 400 cease and desist letters and filed more than 20 lawsuits. Thus, the jury was free to infer that the source-identifying function of Marley's persona had not weakened to the extent that there was no likelihood of confusion.

Also, Plaintiffs introduced evidence that Valencia approached Rohan Marley, one of Bob Marley's sons and an owner of Hope Road, seeking rights to create Bob Marley merchandise. These actions imply Hope Road was known to be associated with Bob Marley's image. Additionally, Scott Holroyd, general manager at Balzout (a former A.V.E.L.A. licensee), testified in a video deposition played at trial that it was "common understanding in the licensing industry" that Hope Road owned the rights to Marley. Kimberly Cauley, Freeze's vice president of licensing, also stated that she knew of Zion's license to Marley's persona based on "market knowledge."

### C. The false endorsement claim does not fail for lack of an endorsement.

Defendants argue that the 15 U.S.C. § 1125(a) claim fails, because Marley's image needed to have been used in connection with a separate product or service to constitute an "endorsement." As Plaintiffs point out, the statute does not mention "endorsement." Rather, we commonly call § 1125(a) claims "false endorsement claims" because they often involve likelihood of confusion as to a plaintiff's "sponsorship or approval" of the defendant's product. *See* § 1125(a)(1)(A).

Rather than the lack of the word "endorsement," it is the statutory phrase referring to a defendant's use of the mark "*on* . . . any goods*,*" § 1125(a)(1) (emphasis added), that requires

us to reject Defendants' argument. The "goods" in the phrase "on any goods" refers to the goods consumers may mistakenly think are approved by the owner of the mark. *See id.* Thus, the plain text of the statute establishes that a viable false endorsement claim does not require that the mark be used *in connection* with separate goods to promote the purchase of those separate goods—but may be used directly *on* the defendant's goods. *See id.*; *Wendt*, 125 F.3d at 812–14 (denying defendants' summary judgment motion on a § 1125(a) claim arising from the placement of animatronic robots resembling *Cheers* actors *in* defendants' bars to purportedly imply the actors' endorsement of defendants' bars).

Here, the fact that Marley's image appears directly on Defendants' merchandise does not preclude relief under § 1125(a). Instead, as in any § 1125(a) claim, the particular use and placement of the mark is probative of likelihood of confusion. As discussed above, the jury found Defendants' use was likely to confuse, and we may not disturb that finding.

## D. The judgment does not overextend the Lanham Act by creating a federal right of publicity.

A.V.E.L.A. Defendants and Freeze argue that allowing a plaintiff to vindicate a 15 U.S.C. § 1125(a) claim predicated on the use of a deceased celebrity's persona essentially creates a federal right of publicity.

Assuming Congress did not intend the Lanham Act to protect such rights, the § 1125(a) claim in this case is not tantamount to a federal right of publicity. State publicity right claims protect a plaintiff when the defendant uses the

plaintiff's identity for commercial advantage, without permission. *See e.g.*, *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996) (analyzing California law). However, § 1125(a) claims require an additional element—that the use be likely to confuse as to the sponsorship or approval of a defendant's goods. *See* 15 U.S.C. § 1125(a). We have previously distinguished between publicity right claims and § 1125(a) claims on the basis of this additional element. *See Abdul-Jabbar*, 85 F.3d at 414; *c.f. Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149 (9th Cir. 2002) ("*Cairns III*") ("Under the law of false endorsement, likelihood of customer confusion is the determinative issue."). Moreover, the Second Circuit agrees that this distinction is significant. *Rogers*, 875 F.2d at 1004 ("Because the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement, it is potentially more expansive than the Lanham Act.").

A.V.E.L.A. Defendants and Freeze assert that "the Lanham Act false association claim is essentially a federal right of publicity claim in disguise," because consumers would always "associate a deceased celebrity's image with that of his or her estate." But a plaintiff must show more than mere association to succeed in a false endorsement claim. *See Downing*, 265 F.3d at 1007–08. As discussed above, we cannot disturb the jury's finding regarding likelihood of confusion, but the outcome of this case is in part a function of defenses expressly waived by Defendants. We are not in the position to assess the Defendants' litigation strategy. Contrary to their assertion, our decision to affirm the jury's verdict does not create a federal right of publicity.

To the extent A.V.E.L.A. Defendants and Freeze argue that Congress generally did not intend § 1125(a) to cover claims brought by celebrities' estates or successors-in-interest

based on celebrity persona, the legislative history does not demonstrate limitation of such claims. Further, this court already treats a celebrity's persona as identifiable intellectual property protectable under the Lanham Act. *See White*, 971 F.2d at 1400. This property exists whether the holder is the celebrity or a successor in interest. Thus, the fact of the celebrity's death does not preclude a § 1125(a) claim. Rather, the "determinative issue" (in any § 1125(a) claim) is likelihood of confusion. *See Cairns III*, 292 F.3d at 1149.

## II. The district court did not err in awarding Plaintiffs $348,543.00 (A.V.E.L.A.'s, Jem's, and Freeze's total net profits).

15 U.S.C. § 1117(a) provides:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. . . . If the court

shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find just, according to the circumstances of the case. Such sum . . . shall constitute compensation and not a penalty.

An award of profits "is not automatic" upon a finding of infringement. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993), *superseded by statute on other grounds*, Trademark Amendments Act of 1999, Pub. L. No. 106-43, 113 Stat. 218. Rather, profits "must be granted in light of equitable considerations." *Id.* In seeking to achieve equity between the parties, the court must fashion a remedy wherein the defendant may "not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not . . . [given] a windfall." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 918 (Fed. Cir. 1984). Awarding profits "is proper only where the defendant is 'attempting to gain the value of an established name of another.'" *Lindy Pen Co.*, 982 F.2d at 1406 (quoting *Maier Brewing Co. v. Fleischmann Distilling Co.*, 390 F.2d 117, 123 (9th Cir. 1968)). "Willful infringement carries a connotation of deliberate intent to deceive." *Id.* Generally, "deliberate, false, misleading, or fraudulent . . . conduct . . . meets this standard." *Id.* (internal quotation marks omitted). "Willfulness . . . 'require[s] a connection between a defendant's awareness of its competitors and its actions at those competitors' expense.'" *Id.* (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 966 (D.C. Cir. 1990)).

**A. There was sufficient evidence to support the finding of willfulness as to Freeze.**

Freeze claims that there was insufficient evidence to support the jury's finding that Freeze violated 15 U.S.C. § 1125(a) willfully, requiring reversal of the district court's order disgorging Freeze's profits. Freeze is incorrect.

At trial, Kim Cauley, vice president of licensing for Freeze, testified as follows: Before Freeze began selling Marley merchandise, Cauley received a phone call from Doreen Crujeiras, a licensing agent for Hope Road, who notified her that "Hope Road or the Marley family owned the rights in Bob Marley." Crujeiras said that A.V.E.L.A. did not have the right to use Marley's name and likeness. Cauley also knew that Zion had a license to sell Bob Marley merchandise, and this awareness predated Freeze's first sales of Marley merchandise. Thus, viewing the evidence in the light most favorable to Plaintiffs, Cauley's testimony demonstrates Freeze's "awareness of its competitors and its actions at those competitors' expense." *Lindy Pen Co.*, 982 F.2d at 1406 (internal quotation marks omitted); *see also E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 472, 475 (N.D. Cal. 1992) ("Use of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement.").

**B. There is no Seventh Amendment right to have a jury calculate profits.**

A jury found Defendants had violated § 1125(a). Over Plaintiffs' objection, the trial judge calculated A.V.E.L.A.'s, Jem's, and Freeze's net profits from Marley merchandise based on the evidence the parties submitted. Plaintiffs claim

that this procedure violated their Seventh Amendment right to a jury trial, because the Seventh Amendment necessitates a jury calculation of profits to be disgorged.[6] We review the question of entitlement to a jury trial de novo. *S.E.C. v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993).

The Seventh Amendment guarantees a litigant's right to a jury trial on "suits at common law." U.S. Const. amend. VII. "Although the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common-law forms of action recognized at that time." *Curtis v. Loether*, 415 U.S. 189, 193 (1974). "Suits at common law" include statutory claims that are legal (as opposed to equitable). *Feltner*, 523 U.S. at 348. To determine whether a particular claim invokes this right, we (1) "must 'compare the statutory action to the 18th-century actions brought in the courts of England prior to merger of the courts of law and equity," and (2) "must 'examine the remedy sought and determine whether it is legal or equitable in nature.'" *Rind*, 991 F.2d at 1493 (quoting *Tull v. United States*, 481 U.S. 412, 417–18 (1987)). "The second inquiry is more important." *Id.*

---

[6] Plaintiffs do not argue that the trial judge violated § 1117 by calculating the profits himself. Indeed, § 1117(a) vests "the court" (meaning the judge) with the power to assess profits. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998) (The word "court" means "judge" when used "in contexts generally thought to confer authority on a judge, rather than a jury," e.g., granting injunctions.); 15 U.S.C. § 1114(2)(D)(iv) ("The court may also grant injunctive relief . . . ."); 15 U.S.C. § 1116(d) (authorizing "the court" to grant an order "providing for the seizure of goods and counterfeit marks" and requiring such order to contain findings of fact and conclusions of law).

If the overall claim "belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791" (when the Seventh Amendment was ratified). *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708 (1999). We consider whether, in 1791, juries typically decided the issue in question (or an analogous one). *Id.* at 718. If "history does not provide a clear answer, we look to precedent and functional considerations." *Id.*

In applying this framework, we keep in mind that the narrow Seventh Amendment right "preserve[s] the basic institution of jury trial in only its most fundamental elements." *Tull*, 481 U.S. at 426 (quoting *Galloway v. United States*, 319 U.S. 372, 392 (1943)). Accordingly, "[o]nly those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed beyond the reach of the legislature." *Id.*

A claim for disgorgement of profits under § 1117(a) is equitable, not legal. Litigants filed trademark-like actions in "deceit" prior to 1791, but these suits were rare. *See* Mark A. Thurman, *Ending the Seventh Amendment Confusion: A Critical Analysis of the Right to a Jury Trial in Trademark Cases*, 11 Tex. Intell. Prop. L.J. 1, 60–63 (2002) (only three known cases prior to 1791—two in courts of law, one in court of equity). While this historical record illuminates little, the current law recognizes that actions for disgorgement of improper profits are equitable in nature. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990); *Tull*, 481 U.S. at 424; *City of Monterey*, 526 U.S. at 710 (equitable monetary remedies focus on "what . . . the [defendant] gained"); *Reebok Int'l, Ltd.*, 970 F.2d at 559 ("An

accounting of profits under § 1117(a) is not synonymous with an award of monetary damages: [a]n accounting for profits . . . is an equitable remedy subject to the principles of equity." (internal quotation marks omitted)).

Contrary to Plaintiffs' argument, *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) does not broadly hold that a Lanham Act claim for disgorgement of profits is a legal claim. Rather, the Supreme Court characterizes the *Dairy Queen* claim as a legal claim for damages (not disgorgement of profits). *See Feltner*, 523 U.S. at 346.

Moreover, even if the claim were legal, the specific issue of profit determination cannot be said to be traditionally tried to a jury. *See City of Monterey*, 526 U.S. at 718. Again, the slim history of pre-1791, trademark-like cases certainly does not support that notion. Turning to current law, § 1117's language allows judges to determine the amount of profits, which judges regularly do. Consequently, the determination of profits under § 1117 is not "fundamental, . . . inherent in and of the essence of the system of trial by jury."  *Tull*, 481 U.S. at 426.

## C.  The district court did not err in calculating profits.

"[A]ny decision concerning the awarding of an accounting of profits remedy should remain within the discretion of the trial court." *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982). Accordingly, we will not disturb the district court's decision "unless there is a 'definite and firm conviction that the court below committed a clear error of judgement in the conclusion it reached upon a weighing of the relevant factors.'" *Id.*

(quoting *Chism v. Nat'l Heritage Life Ins. Co.*, 637 F.2d 1328, 1331 (9th Cir. 1981).

The trademark holder has the burden to prove the defendant infringer's gross revenue from the infringement. *Lindy Pen Co.*, 982 F.2d at 1408. Then the burden shifts to the defendant infringer to prove expenses that should be deducted from the gross revenue to arrive at the defendant infringer's lost profits. *See Experience Hendrix v. Hendrixlicensing.com*, Nos. 11-35858, 11-35872, slip op. at 27 (9th Cir. Aug. 8, 2014).

### 1.  A.V.E.L.A.'s deductions

A.V.E.L.A. claims that the district court abused its discretion by not allowing deductions reflecting (1) a 40% royalty fee paid to V. International, which A.V.E.L.A. claimed equaled $222,771.00; and (2) marketing, travel, overhead, and trade show expenses connected with promoting Marley merchandise. Not so. Acting within its discretion, the district court held that A.V.E.L.A. failed to meet its burden to prove these deductions. The royalty fee arrangement was not an arms' length transaction. The sole shareholder and employee of V. International was Valencia's girlfriend, Liza Acuna. Moreover, the documentary evidence leaves uncertainty as to the amount of royalty fees paid. Regarding the other expenses, Plaintiffs argue A.V.E.L.A. did not produce sufficient documentation to prove the specific amounts. A.V.E.L.A. does not attempt to rebut any of these arguments. Given these doubts, the district court was within its discretion to deny these deductions.

### 2.      Jem's deductions

First, Plaintiffs claim the district court erred by reopening discovery to allow Jem to produce proof of its deductible costs *after* trial, when Jem had only produced an unsupported summary document of its costs prior to trial. While Plaintiffs might consider this unfair, the district court's decision was within its broad discretion. Plaintiffs cite no legal support showing otherwise.

Second, Plaintiffs claim that Jem introduced insufficient supporting documentation to sustain its burden to prove that it paid salespersons $130,271.47. The district court did not abuse its discretion by relying on the report by Jem's controller, Linda Lyth. Lyth testified in her declaration as an expert, and in general, experts need not disclose all underlying documents on which they rely. *See* Fed. R. Evid. 705.[7] For the same reason, we reject Plaintiffs' objection to Jem's Gross Margin Invoice Summary Register.

Third, Plaintiffs challenge the $72,989.64 deduction for discounts given to retailers. The district court considered Jem's agreements with retailers showing their respective discounts. The dollar value of retailer discounts was reached by multiplying these rates by the total sales. Contrary to Plaintiffs' argument, Jem did not need to submit proof that the retailers used their discounts, when there was no evidence that they did not do so. It would be reasonable to infer that the retailers took advantage of wholesale markdowns when they

---

[7] While Plaintiffs claim Lyth "admitted she had no personal knowledge of [the commission] payments," the record evidence they cite contains no such admission.

contracted for them, a matter within the district court's discretion. *See Playboy Enters., Inc.*, 692 F.2d at 1275.

Finally, Plaintiffs argue that Jem did not prove that the $0.80-per-garment processing cost Jem paid its affiliate (Jem Equipment) was competitive. However, the law does not require that an infringer prove its expenses were competitive in addition to proving it actually incurred them.

### 3. Increased profits

Plaintiffs also argue that the district court abused its discretion by declining to award increased profits. The district court has discretion to increase the profit award above the net profits proven "[i]f the court shall find . . . the amount of the recovery . . . inadequate." 15 U.S.C. § 1117(a). It must apply "principles of equity," *id.*, and ensure that the defendant "may not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not . . . [given] a windfall," *Bandag, Inc.*, 750 F.2d at 918. "The Lanham Act allows an award of profits only to the extent the award 'shall constitute compensation and not a penalty.'" *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011) (quoting 15 U.S.C. § 1117(a)).

The district court ought to tread lightly when deciding whether to award increased profits, because granting an increase could easily transfigure an otherwise-acceptable compensatory award into an impermissible punitive measure. *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1114–15 (9th Cir. 2012). Generally, actual, proven profits will adequately compensate the plaintiff. Because the profit disgorgement remedy is measured by the defendant's gain, the district court should award actual, proven profits unless

the defendant infringer gained more from the infringement than the defendant's profits reflect.

Plaintiffs have not presented evidence or argument to inspire a "definite and firm conviction" that the district court "committed a clear error of judgement," *Playboy Enters., Inc.*, 692 F.2d at 1275, in declining to award increased profits. While Plaintiffs allude to Defendants accruing goodwill from their infringement, they cite no supporting evidence. Similarly, Plaintiffs only cursorily explain how putative sales abroad might fall within the Lanham Act's coverage under *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500 (9th Cir. 1991). We will not manufacture arguments on their behalf or pick through the record without further direction. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). Nor do we find compelling the evidence Plaintiffs cited to show that Defendants concealed some of their profits.

Given the district court's "wide scope of discretion . . . in . . . fashioning . . . a remedy," *Faberge, Inc. v. Saxony Prods., Inc.*, 605 F.2d 426, 429 (9th Cir. 1979) (internal quotation marks omitted), it did not err by denying Plaintiffs an increased award of profits.

## III.    The district court did not err in ordering A.V.E.L.A. Defendants to pay attorneys' fees.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). We review an attorneys' fee award for abuse of discretion, except that "the district court's legal determination that an action is 'exceptional' under the Lanham Act" we review de

novo. *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 687 (9th Cir. 2012).

## A. Prevailing party

The district court determined that Plaintiffs were the prevailing party. A party is a prevailing party for purposes of an attorneys' fee award if it "achieved a material alteration in the legal relationship of the parties that is judicially sanctioned." *Klamath Siskiyou Wildlands Ctr.*, 589 F.3d at 1030 (internal quotation marks omitted).**[8]** "The material alteration in the legal relationship of the parties must be relief that the would-be prevailing party sought." *Id.* A party need not succeed in all of its claims to be the prevailing party. *San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 741 (9th Cir. 2009). Because Plaintiffs obtained an injunction against all Defendants and disgorgement of profits from A.V.E.L.A., Jem, and Freeze, Plaintiffs obtained "a material alteration in the legal relationship of the parties that is judicially sanctioned." *See Klamath Siskiyou Wildlands Ctr.*, 589 F.3d at 1030.**[9]** Thus, the district court did not abuse its discretion in finding Plaintiffs were the prevailing party.

---

**[8]** The term "prevailing party" is interpreted consistently throughout the U.S. Code. *Klamath Siskiyou Wildlands Ctr.*, 589 F.3d at 1030.

**[9]** Also, the record does not support A.V.E.L.A. Defendants' surmise that the district court relied on a media headline stating Plaintiffs were prevailing parties in making its determination.

## B.  Exceptional case

The district court also held that the instant action was an exceptional case within the meaning of § 1117(a) as to all Defendants. A case is considered exceptional "when the infringement is malicious, fraudulent, deliberate, or willful." *Gracie*, 217 F.3d at 1068 (internal quotation marks omitted). Egregious conduct is not required. *TrafficSchool.com, Inc.*, 653 F.3d at 833. Nor is bad faith. *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1218 (9th Cir. 2003). We consider the relief obtained, *see TrafficSchool.com, Inc.*, 653 F.3d at 832, and whether the relevant area of law was unclear when the defendant's conduct occurred, *Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 32–33 (1st Cir. 2002).

The district court properly considered the relevant evidence and held that Defendants had acted willfully. *See id.* at 31. A.V.E.L.A. Defendants argue that the uncertainty of the law makes A.V.E.L.A.'s infringement not willful. In this case, the uncertainty of the law weighs in A.V.E.L.A. Defendants' favor, but that consideration is only one aspect of the willfulness inquiry. There was significant evidence that A.V.E.L.A. Defendants were aware their conduct conflicted with Plaintiffs' rights. Rohan Marley testified that Valencia (president and CEO of both A.V.E.L.A. and X One X) approached him seeking a license to sell Marley merchandise, which neither Rohan nor Hope Road granted. Roberto Rabanne, a photographer who took pictures of Bob Marley, testified that Valencia had convinced him to write a false email to help Valencia negotiate with the Marley family for a license. The email falsely stated that Rabanne had used photographs of Marley on merchandise during Marley's lifetime. Rabanne also testified that he refused Valencia's

request to backdate a 2006 photograph licensing agreement between them to 2003 or 2004. According to Rabanne, Valencia claimed that backdating the agreement would help him in "negotiations." Valencia also asked Rabanne to delete emails from him and files on his hard drive and said he would flood the market with Marley merchandise so that Plaintiffs could not use the photographs of Marley anymore. Liza Acuna, A.V.E.L.A.'s licensing agent and Valencia's girlfriend, testified that she had known since 2005 that Zion had the license for Marley. Thus, even considering the uncertainty of the law, this conduct exhibits a subjective belief that A.V.E.L.A. Defendants' conduct infringed Plaintiffs' intellectual property rights.

A.V.E.L.A. Defendants also assert that the district court erred in finding the case "exceptional," because (1) Plaintiffs achieved only limited success, and (2) Plaintiffs' other awards make A.V.E.L.A.'s infringement unprofitable. We reject these contentions. While it is true that Plaintiffs only prevailed on two of their five claims, they successfully enjoined Defendants from any future merchandising of Marley's image and disgorged profits. The five claims were merely different means to that end.

Regarding the next issue, whether A.V.E.L.A.'s conduct was rendered unprofitable is inapposite. The attorneys' fee award served the separate purpose of encouraging the enforcement of trademark rights by more fully compensating Plaintiffs. *See id.* at 34. Thus, we affirm the district court's award of attorneys' fees against A.V.E.L.A. Defendants.

**C. Declining to award attorneys' fees as to Jem and Freeze**

Plaintiffs claim that the district court abused its discretion by determining the case "exceptional . . . as to each Defendant" but then failing to assess attorneys' fees against Jem and Freeze. However, the plain language of the statute allows the court to choose whether to award fees, even after finding the case exceptional. *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award . . . fees ."). The fact that "in exceptional cases" precedes "may" means that the case must be exceptional for attorneys's fees to be awarded, but in an exceptional case, the district court "may" (or may not) award fees.

Plaintiffs also argue that the district court's decision that the evidence of willfulness was sufficient to support the jury's finding and the court's statement that the evidence of Jem's willfulness was weak were in conflict. Plaintiffs are wrong, because the sufficiency of the evidence standard is lower than the standard for showing a case is exceptional. *See Harper*, 533 F.3d at 1021. Thus, the court consistently concluded that evidence of Jem's willfulness was sufficient, yet too weak to merit an award of attorneys' fees as to Jem and Freeze.

Plaintiffs seemingly claim that the district court's decision to not grant fees as to Jem and Freeze was illogical or inconsistent with its decision to grant fees as to A.V.E.L.A. Defendants. Plaintiffs claim that some of the bases on which the district court relied to deny fees as to Jem and Freeze also existed with respect to A.V.E.L.A. Defendants (prevailing on "one Lanham Act claim," other monetary awards serve different purposes than an award of attorneys' fees).

However, the mere fact that the district court, after weighting the various considerations, awarded fees as to the A.V.E.L.A. Defendants does not demonstrate that the district court was required to award fees as to the other Defendants. On balance, the weightier evidence of A.V.E.L.A. Defendants' willfulness justified an award of fees. Moreover, the district court pointed out that the evidence that Jem and Freeze caused actual damages was comparatively weak.

Plaintiffs' argument that the district court should not have relied on the award of profits to deny fees as to Jem and Freeze has some merit. A monetary award should *support* the decision to assess fees. *See TrafficSchool.com, Inc.*, 653 F.3d at 832. However, the district court discussed the weight of the evidence of willfulness and actual damages at length and only mentioned profits briefly, apparently considering the underlying actions of the parties to be the main reason to deny fees as to Jem and Freeze. Consequently, the district court did not abuse its discretion in denying attorneys' fees as to Jem and Freeze.

## IV. The district court did not err in granting summary judgment for Defendants on Plaintiffs' Nevada right of publicity claim.

The district court granted summary judgment in Defendants' favor on the basis that Plaintiffs knew of a third-party's unauthorized commercial use of Marley's publicity right more than six months before Plaintiffs registered this right with the Nevada Secretary of State. We review the district court's interpretation of a state statute de novo. *Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program*, 222 F.3d 643, 646 (9th Cir. 2000).

Nevada law establishes "a right of publicity in the name, voice, signature, photograph or likeness of every person," which lasts 50 years after the person's death. Nev. Rev. Stat. § 597.790.1. "Any commercial use by another of the name, voice, signature, photograph or likeness of a person requires the written consent of that person or his or her successor in interest," *id.* § 597.790.2, unless the person whose right of publicity is at issue dies and has no successors in interest. *Id.* § 597.800.2.[10] The right of publicity "is freely transferable." *Id.* § 597.800.1.

"A successor in interest . . . of a deceased person *may* file in the Office of the Secretary of State . . . a verified application for registration of his or her claim." *Id.* § 597.800.3 (emphasis added). "A successor in interest . . . of a deceased person may not assert any right against any unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness that begins before the filing of an application to register his or her claim." *Id.* § 597.800.4.

> A person, firm or corporation seeking to use the name, voice, signature, photograph or likeness of a deceased person for commercial purposes must first make a reasonable effort, in good faith, to discover the identity of any person who qualifies as a successor in interest to the deceased person. A person claiming to be a successor in interest to a deceased person *must*, within 6 months after the date he or she

---

[10] There are also exceptions to the requirement of written consent for certain types of commercial use, *see* § 597.790.2, but those are not at issue here.

> becomes aware or should reasonably have become aware of an unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness, register a claim with the Secretary of State pursuant to subsection 3. Failure to register shall be deemed a waiver of any right of publicity.

*Id.* § 597.800.5 (emphasis added). The district court relied on this last sentence to hold that Plaintiffs had waived Marley's publicity rights as against any defendant for any unauthorized use. Plaintiffs became aware of the unauthorized use of Marley's publicity rights by someone other than Defendants, and Plaintiffs failed to register their claim within the next six months. Plaintiffs argue that the district court erred in its interpretation of the statute, because the six-month registration requirement applies with respect to each unauthorized use, and Plaintiffs registered their rights either before or within six months after learning of Defendants' unauthorized use.

There is no Nevada case law interpreting this registration timeliness requirement. Thus, we must seek to "predict how the [Nevada] high court would resolve" the matter. *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). Accordingly, we must construe the statute to give effect to the legislature's intent, beginning with the plain statutory text, and giving effect to any unambiguous language. *Richardson Constr., Inc. v. Clark Cnty. Sch. Dist.*, 156 P.3d 21, 23 (Nev. 2007). If the statutory language is ambiguous, the panel should "examine the statute in the context of the entire statutory scheme, reason, and public policy to effect a construction that reflects the Legislature's intent." *Id.*

Beginning with the text at issue, "[f]ailure to register shall be deemed a waiver of any right of publicity" is unambiguous. *See* Nev. Rev. Stat. § 597.800.5. "[A]ny right of publicity" indicates that the forfeiture is broad, not limited to the particular unauthorized use a plaintiff became aware of six months or more before. Even assuming ambiguity, the context, reason, and public policy align with the district court's interpretation. Section 597.800.3 provides for permissive registration without reference to the successor in interest's knowledge of any unauthorized use. The successor in interest may only enforce its rights with respect to unauthorized use that occurred after registration. *Id.* § 597.800.4. However, upon learning of an unauthorized use, registration becomes mandatory. *See id.* § 597.800.5. Thus, the permissive and mandatory descriptions are in harmony, as they apply to different situations. Read together, they encourage successors in interest to register sooner rather than later.

Plaintiffs argue that the legislature only intended to create a system to perfect successor rights in § 597.800.3 through .5. If this were so, the difference in language would not make sense. Section 597.800.4 penalizes failure to register by not allowing the successor to "assert any right" against unauthorized use that occurred prior to registration. In contrast, § 597.800.5 penalizes failure to register by deeming a "waiver of any right" of publicity. If the legislature meant that the successor merely could not *assert* its right (but still retains it), it seems the legislature would have used language parallel to that in § 597.800.4. Moreover, § 597.800.5 refers to any "right of publicity," implying the right itself, not the right to assert claims based on the right of publicity.

Plaintiffs also argue that the purpose of the statute is to bestow rights, not forfeit them. Of course this is broadly true. However, the legislature apparently intended to limit a successor's right. The successor's right extinguishes 50 years after the person's death. *Id.* § 597.790.1. Also, living persons enforcing their own rights to publicity do not ever have to register their rights. *See id.* § 597.790–.800. Thus, the six-month registration requirement is in line with the qualified nature of rights allowed successors under the statute.

## V. There was sufficient evidence to support the jury's verdict on the interference claim.

> Liability for the tort of intentional interference with prospective economic advantage requires proof of the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

*Wichinsky v. Mosa*, 847 P.2d 727, 729–30 (Nev. 1993).

With respect to Plaintiffs' prospective relationship with Walmart, A.V.E.L.A. Defendants claim there was insufficient evidence to support the fifth element—whether Plaintiffs

were harmed as a result of A.V.E.L.A. Defendants' conduct.[11] At trial, Doreen Crujeiras, a licensing agent for Hope Road, testified to the following: Hybrid was an apparel manufacturer and one of Hope Road's Marley merchandise licensees that generally sold apparel at K-Mart, Target, and Walmart. Hybrid "lost" an order "intended for Walmart." Jem, a licensee of A.V.E.L.A., "got the order instead." This order was "100,000 units of T-shirts and 100,000 units of hoodies." The gross sales would have been "like 1.8 million dollar[s]," and Hope Road's royalty on those sales would have been "about $250,000."

A.V.E.L.A. Defendants do not assert that they offered evidence contradicting Crujeiras's testimony on this point. Rather, they argue that they impeached Crujeiras's testimony. Crujeiras admitted she could not remember "exactly who told [her]" about the lost order. Also, defense counsel asked Crujeiras, "[Y]ou don't have any knowledge that A.V.E.L.A. or anybody from the defendants went in and undercut Hybrid's efforts to sell to Walmart[?]" Crujeiras answered, "Well, I did have that one conversation with the owner of Hybrid. It was a conference call that I participated on. And he was very upset and he did say that, you know, it was a problem for him." Crujeiras's cryptic answer could give rise to an inference that she had no basis for believing Defendants were responsible for the lost order, and that she actively avoided admitting that. However, her answer could also be understood to mean that A.V.E.L.A. Defendants' interference was the "problem" to which the owner of Hybrid referred.

---

[11] In their opening brief, A.V.E.L.A. Defendants only challenged sufficiency of the evidence as to Walmart on this basis. Thus, claims of insufficient evidence based on other elements of the tort are waived. *See Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998).

Without more, this vague answer on cross-examination does not establish that Crujeiras's uncontradicted testimony was "sheer surmise and conjecture," as A.V.E.L.A. Defendants claim, because the evidence must be "construed in the light most favorable to [Plaintiffs]." *See Harper*, 533 F.3d at 1021.

A.V.E.L.A. Defendants also argue that Crujeiras's testimony was biased. This argument fails, because we may not assess the credibility of witnesses in determining whether sufficient evidence exists. *See id.* A.V.E.L.A. Defendants cite no authority for their argument that Hope Road needed to state the exact amount of lost royalties in order for its evidence that Hope Road was actually damaged to be sufficient. Moreover, providing sufficient evidence that Hope Road lost royalties from a prospective deal, no matter how much the loss equaled, would satisfy this inquiry. The amount of the loss is necessary for damage calculation, not proving Hope Road was "actual[ly] harm[ed]." *See Wichinsky*, 847 P.2d at 730. The evidence was sufficient to support the challenged element of actual harm.[12]

## VI.    The district court did not err in granting Defendants' motion for judgment as a matter of law on the issue of punitive damages.

We review de novo the district court's order granting a motion for judgment as a matter of law. *Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir. 1999). Defendants moved for

---

[12] Because there was sufficient evidence with respect to the prospective business relationship with Walmart, we need not reach A.V.E.L.A. Defendants' other arguments regarding Wet Seal, JGR Copa, Target, and Ecko. The interference claim only requires an expectancy of a single business relationship. *See Wichinsky*, 847 P.2d at 729–30.

judgment as a matter of law at trial. The district court granted the motion as to Plaintiffs' claim for punitive damages and denied as to Plaintiffs' claim for intentional interference with a prospective business relationship. Plaintiffs first argue that this decision was inconsistent, because both claims relied on the same evidence of Defendants' intent.

Punitive damages require a showing *by clear and convincing evidence* that Defendants acted with "oppression, fraud or malice, express or implied." Nev. Rev. Stat. § 42.005.1. "Malice, express or implied" is defined as "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." *Id.* § 42.001. The intentional interference claim requires a plaintiff to prove that the defendant "inten[ded] to harm the plaintiff by preventing the relationship." *Wichinsky*, 847 P.2d at 729–30. However, the burden of proof for an intentional interference claim is preponderance, not clear and convincing. *See Holliday v. McMullen*, 756 P.2d 1179, 1180 (Nev. 1988) (per curiam). In a case analyzing intentional interference with a prospective business relationship, the Nevada Supreme Court held that "[t]ort liability alone is insufficient to support an award of punitive damages." *Wichinsky*, 847 P.2d at 730. Thus, the district court's decisions were not inconsistent.

We also reject Plaintiff's second argument—that the district court found there was sufficient evidence to instruct the jury on punitive damages before granting judgment as a matter of law to Defendants on the same issue. Plaintiffs are simply wrong in their construction of the trial transcript, which reveals that the district court did not find that there was sufficient evidence to instruct the jury on punitive damages. Instead, the district court merely expressed its current

thoughts on the matter, stating that "at this stage" "I think the jury should be instructed on punitive [damages]." Due to the inconclusive nature of the statement, there was no conflict.[13]

## CONCLUSION

We **AFFIRM** all decisions of the district court appealed in this case.

CHRISTEN, Circuit Judge, concurring in part and dissenting in part:

I concur in the result reached by the court but do not join the reasoning in Subsection I.B.2 of its opinion. In my view, the narrow holding in Part I is dictated by the standard of review on appeal, and by the defenses actually pursued by defendants.

## I.

Presented with two T-shirts—one bearing an iconic image of Bob Marley and one bearing the image of an unknown African American male with dreadlocks—members of the public were asked: (1) "Who do you think made or put out this particular T-shirt?" and (2) "Who do you think gave their permission or approval for this particular T-shirt to be made or put out?" The first question bears upon a "source or

---

[13] Plaintiffs raise a new basis for challenging punitive damage decision in their reply brief, citing for the first time evidence they claim shows Defendants' malice. Because Plaintiffs did not cite any of this evidence in their first brief, we will not consider it. *See Kim*, 154 F.3d at 1000.

origin" claim.  Because plaintiffs concede their infringement claim "is not based on consumer confusion as to the source or origin of Defendants' merchandise," the responses to the first survey question lend no support to plaintiffs' cause.

If any evidence of consumer confusion is to be gleaned from the responses to plaintiffs' survey, it would have to come from the second question: "Who do you think gave their permission or approval for this particular T-shirt to be made or put out?"  37% of respondents in the test group and 20% of respondents in the control group answered "Bob Marley" (or "the person on the shirt") or his heirs, estate, or agents.  Respondents were then asked why they thought this was the case.  Representative answers include: "Because I don't know anyone else that would have those types of rights," "Because his picture is on the shirt," and "I'm assuming there's some kind of copyright."

The responses to the second question show two things: (1) members of the public have no problem recognizing the late Bob Marley, an internationally famous musician; and (2) members of the public share a common lay legal opinion that Marley, or someone connected with Marley, must have sponsored the T-shirt. But this lay legal opinion is likely to be held by the majority of survey respondents every time merchandise bears a readily recognizable celebrity image. *See* McCarthy on Trademarks and Unfair Competition § 24:12 (4th ed. 2014) (describing survey in which 91.2% of consumers agreed with the statement: "No product can bear the name of an entertainer, cartoon character, or some other famous person unless permission is given for its use by the owner of the name or character.").

The T-shirts in this case do not bear an affixed, recognizable label, logo, or mark.  Indeed, plaintiffs repeatedly refer to their asserted interest as "trademark-like." They argue that their interest lies in Marley's image itself, which appears on the T-shirt and was arguably the very product being purchased.  For this reason, this case presents a unique situation:  rather than being deceived by the mark on the product being purchased, the facts suggest that consumers may have received exactly what they bargained for: a T-shirt with a picture of Bob Marley on the front.

The purpose of a § 43(a) claim is to prevent consumers from being misled or tricked into making purchases through use of a trademark.  *Pom Wonderful LLC v. Coca-Cola Co.*, 134 S.Ct. 2228, 2233 (2014) ("The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling."); *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th Cir. 1980) (observing the purpose of Lanham Act trademark provision is "to protect consumers against deceptive designations of the origin of goods and, conversely, to enable producers to differentiate their products from those of others").  The responses to the second survey question tell us nothing about whether consumers' purchasing decisions are likely to be influenced by confusion about who had given permission to produce the shirts.[1]  Plaintiffs did not allege that the use of

---

[1] The record contains only three survey responses that might have possibly affected purchasing decisions: "He should get paid when someone uses his picture, even if he's not with us," "If he was my family, I would want someone to ask my permission if they were going to sell T-shirts of a dead family member,"  and "Because it's based on a celebrity, and his son will probably get the royalties." Even when construed in the light most favorable to plaintiffs, three responses are insufficient to establish actual consumer confusion.

Marley's image conveyed an indication or endorsement that the T-shirts were of a particular quality, or that they were the "official" T-shirt that had special memorabilia value. Plaintiffs' claim is simply that consumers mistakenly understood that Marley (or someone connected with his estate) must have given permission for the use of Marley's image on the T-shirt. Without a showing that consumers *cared* whether permission had been given, the second survey question only shows that most consumers share a common lay legal opinion that a celebrity must give permission before his or her image may be used; it does nothing to suggest that the use of Marley's image on the T-shirt runs afoul of the purpose of the Lanham Act.

In my view, the word "confusion" in § 43(a) must be read in light of the Lanham Act's purpose. Therefore, where a celebrity image is itself the only indication of sponsorship, I would hold that a finding of actual confusion under § 43(a) must be supported by some evidence that the confusion could have had an impact on the consumers' purchasing decisions. *See* Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli*, 54 Emory L.J. 461, 488 (2005) ("If individuals don't care one way or the other whether the trademark holder sponsors or endorses such products or whether the products are officially licensed, then the competitive process certainly does not suffer from their assumption that the use required a license."). If not read in context, *Downing*'s actual confusion factor becomes a nullity because consumers' common understanding about who must have authorized the use of a celebrity image may well have nothing to do with the product. Here, I would give no weight to plaintiffs' survey responses because plaintiffs did not show that consumers might be misled into buying the T-shirt based on whether permission had been given.

## II.

Evidence of actual consumer confusion is just one of the eight factors considered under *Downing*, and, in this case, several other *Downing* factors support the jury's finding of consumer confusion.  *See Hana Fin., Inc. v. Hana Bank*, 574 U.S. __ (2015) ("Application of a test that relies upon an ordinary consumer's understanding of the impression that a mark conveys falls comfortably within the ken of a jury. . . . [W]hen the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decision maker that ought to provide the fact-intensive answer.").  On this record, I cannot conclude that "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is the contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

It is difficult to over-state the extent to which this result is the product of the unique way this case was litigated.  We address the case as it is presented to us, but it is worth restating that our holding is very narrow, and largely a function of issues and defenses the parties chose not to litigate.